IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                                  )
                                        )
WILLIAM IRVIN LIPFORD and               )        Case No. 07-10776
REBECCA ANN LIPFORD,                    )
                                        )
                    Debtors.            )
_____)

## MEMORANDUM OPINION

This matter came before the Court on March 3, 2008 upon the Motion of Bankruptcy

Administrator for Dismissal of Case Pursuant to Section 707(b)(3) (the "Motion to Dismiss")

filed by the United States Bankruptcy Administrator (the "Bankruptcy Administrator") on

August 31, 2007.  An additional evidential hearing was held on March 13, 2008.  At both

hearings, Philip E. Bolton appeared on behalf of William and Rebecca Lipford (the "Debtors")

and Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator.  After

consideration of the Motion to Dismiss, the evidence presented at the hearings, the arguments of

the parties, and the relevant law, the Court will grant the Motion to Dismiss.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28

U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States

District Court for the Middle District of North Carolina on August 15, 1984.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) which this Court has the jurisdiction

to hear and determine.

## II.  FACTS

On May 31, 2007, the Debtors filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code. The Debtors are married and have two minor children.  Both Debtors testified that they filed for bankruptcy relief because they simply could not pay their bills as they came due.  Additionally, the male Debtor testified that in the past the family ate out often and that the Debtors spent money on nonessential recreational activities and items for their children, without worrying about the cost.

The Debtors filed their Form B22A Statement of Current Monthly Income and Means Test Calculation (the "Form B22A") with their petition. On the Form B22A, the Debtors reported current monthly income of $7,779.42 (line 12) and annualized income of $93,353.04 (line 13).  The male Debtor reported currently monthly income totaling $3,459.43.  The female Debtor reported current monthly income totaling $4,319.99.  The median family income for a family of four in North Carolina is $61,402.00 (line 14). After subtracting the allowed deductions, the Debtors report negative $507.70 of monthly disposable income under Section 707(b)(2) (line 50). The Debtor's 60-month disposable income is negative $30,462.00 ($507.70 x 60) (line 51).

The Debtors filed all necessary schedules with their petition.  The Debtors' Schedule A shows that the Debtors own real property valued at $125,000.00 and encumbered by a deed of trust securing indebtedness of approximately $122,800.00.  Schedule B, as amended on June 13, 2007, shows that the Debtors own personal property valued at $71,320.00, including a 2003 Chevrolet Tahoe and a 2002 Mitsubishi Eclipse (the "Eclipse"), valued at $20,700.00 and $8,500.00, respectively.  Schedule D indicates that the Debtors owe a total of $173,800.00 on

2

their secured claims.  The Debtors' unsecured debt, as reflected on Schedule F, totals $21,250.00.    The Debtors' Schedule I shows combined average monthly income of $5,339.58.[1] The Debtors' original Schedule J showed average monthly expenses totaling $4,911.00, leaving a monthly net income of $428.58.  However, the Debtors filed an amended Schedule J on February 27, 2008, which shows an increase in their monthly expenses of $438.24.[2]  The Debtors' average monthly expenses increased to $5,349.24, leaving net monthly income of negative $9.66.

On July 27, 2007, the Bankruptcy Administrator filed a Statement that no Presumption of Abuse has Arisen Under 11 U.S.C. §707(b)(2), but on August 31, 2007, the Bankruptcy Administrator filed the Motion to Dismiss based on Section 707(b)(3) of the Bankruptcy Code. The Bankruptcy Administrator argues that the Debtors' schedules are inaccurate and that certain deductions and expenses are incorrect or excessive.  Also, post-petition the Debtors made $96.00 monthly payments to Consumer Financial on an unsecured debt.  Lastly, the Bankruptcy Administrator points out that the Debtors failed to list several assets: four life insurance policies with a total surrender value of $2,154.75, and a 2006 Cub Cadet lawn tractor, which the Debtors value at $3,900.

---

[1] The male Debtor earns an average gross monthly income of $2,762.50 with total payroll deductions of $772.93, leaving an average monthly income of $1,989.57.  The female Debtor earns an average gross monthly income of $5,088.00 with total payroll deductions of $1,737.99, leaving an average monthly income of $3,350.01.

[2] Electricity and heating fuel (line 2a) increased by $17.00, home maintenance (line 3) increased by $80.00, medical and dental expenses (line 7) increased by $45.00, transportation costs (line 8) increased by $108.50, taxes (line 12) increased by $24.75, and other expenses (line 17) increased by $162.99 (including school lunches, haircuts, additional care for an incompetent parent, and school field trip expenses).

3

## III. DISCUSSION

The Bankruptcy Administrator seeks dismissal of the Debtors' case pursuant to Section 707(b)(3) of the Bankruptcy Code. Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991) (providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, 2001 Bankr. LEXIS 1896 at 5 (Bankr. M.D.N.C. 2001) ("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers."). For Section 707(b) to be applicable, the debts in the case must be primarily consumer debts, and it must be shown that granting the debtor a Chapter 7 discharge would involve an "abuse" of the provisions of Chapter 7. It is undisputed that the debts in this case are primarily consumer debts. The moving party, in this case the Bankruptcy Administrator, has the burden of proving abuse pursuant to Section 707. In re Sale, No. 06-51290, slip op. at 3 (Bankr. M.D.N.C. Oct. 15, 2007) (2007 WL 3028390); In re Quarterman, 342 B.R. 647, 652 (Bankr. M.D. Fla. 2006) (citing In re Heath, 182 B.R. 557, 561 (B.A.P. 9th Cir. 1995)).

Section 707(b)(1) of the Bankruptcy Code prescribes two alternative standards to determine whether the granting of relief would be an abuse. First, Section 707(b)(2) provides that abuse may be presumed if, under a "means test" formula, the debtors' 60-month disposable

income exceeds a particular threshold amount.[3]  Second, Section 707(b)(3) of the Bankruptcy

Code sets forth that, even if no presumption of abuse arises, a court may still dismiss a case

based upon the particular circumstances of the case. The Bankruptcy Administrator does not

assert that the Debtors failed the means test of Section 707(b)(2).  The Court need only address

whether there is a basis to dismiss the case under Section 707 (b)(3).

Section 707 (b)(3) requires a court to consider, "(A) whether the debtor filed the petition

in bad faith; or (B) [whether] the totality of the circumstances . . . of the debtor's financial

situation demonstrates abuse."  Unlike the pre-BAPCPA version, "§ 707(b)(3) does not require a

showing of 'substantial abuse,' but a lower standard of 'abuse.'"  <u>In re Mondragon</u>, No. 05-

10665, slip op. at 1 (Bank. D.N.M. Aug. 24, 2007) (2007 WL 2461616); <u>In re Mestemaker</u>, 359

B.R. 849, 856 (Bankr. N.D. Ohio 2007); <u>see also</u> <u>In re Colgate</u>, 370 B.R. 50, 56 (Bankr.

E.D.N.Y. 2007) (acknowledging that BAPCPA lowered the standard from "substantial abuse" to

"abuse" but finding it appropriate to apply the pre-BAPCPA two part test for determining

substantial abuse in evaluating a motion to dismiss under § 707(b)(3)).

Section "707(b)(3) incorporates a 'totality of the circumstances' standard, which courts

previously employed as the standard for determining whether to dismiss a debtor's chapter 7

proceeding based on 'substantial abuse' under pre-BAPCPA § 707(b)(2)."  <u>Mondragon</u>, slip op.

at 1; <u>see</u>  <u>Green</u>, 934 F.2d at 572.  Pre-BAPCPA cases, such as <u>Green</u>, are still instructive under

Section 707(b )(3).  <u>See</u> <u>In re dePellegrini</u>, 365 B.R. 830, 832 (Bankr. S.D. Ohio 2007); <u>In re</u>

---

[3]Section 707(b)(2)(A)(I) states: "In considering under paragraph (1) whether the granting
of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists
if the debtor's current monthly income reduced by the amounts determined under clauses (ii),
(iii), and (iv), and multiplied by 60 is not less than the lesser of–(I) 25 percent of the debtor's
nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."

Pfiefer, 365 B.R. 187, 191 (Bankr. D. Mont. 2007); In re Schoen, 2007 WL 643295, 2 (Bankr. D.
Kan. 2007); but see In re Henebury, 361 B.R. 595, 606-607 (Bankr. S.D. Fla. 2007) (doubting
the post-BAPCPA validity of Green and concluding that, because pre-BAPCPA cases applying a
"totality of circumstances" standard for substantial abuse consider ability to pay conjunctively
with bad faith, while § 707(b)(3) separates the "bad faith prong" from the "totality of circum-
stances" prong, pre-BAPCPA cases finding that "totality of circumstances" requires something
more than an ability to pay do not provide guidance to post-BAPCPA cases under the "totality of
circumstances" prong, and holding that "ability to pay, standing alone, is sufficient to warrant
dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3)(B).").  Green remains
instructive in an analysis pursuant to new Section 707(b)(3).  See Mondragon, slip op. at 1.

Under Green, a court is to determine whether to dismiss a case for abuse of Chapter 7 by
considering the totality of the circumstances.  Green, 934 F.2d at 572.  The Fourth Circuit held
that in considering the totality of the circumstances, a court should consider the debtor's ability
to repay his or her debts, as well as review the following factors:

> (1)  Whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability or unemployment;
> (2)  Whether the debtor incurred cash advances and made consumer purchases far
> in excess of his ability to repay;
> (3)  Whether the debtor's proposed family budget is excessive or unreasonable;
> (4)  Whether the debtor's schedules and statement of current income and expenses
> reasonably and accurately reflect the debtor's true financial condition; and
> (5)  Whether the petition was filed in good faith.

Id.  The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to
repay is the primary factor to be considered."  Id.

**A. Ability to Pay**

An appropriate method of evaluating whether a debtor has the ability to repay his or her

6

debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. See, e.g., Shaw, 310 B.R. at 541 ("In contrast with the second factor of the 'totality of the circumstances' test, where 'ability to repay' analyzes the debtor's historical ability to repay debts, 'ability to repay' in this context analyzes the degree to which the debtor could pay creditors a significant portion of the debt under a Chapter 13 plan."). The Court must examine the debtor's future income and future expenses, as well as the debtor's financial situation as of the date of filing. In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989); In re McCain, No. 05-14382, slip op. at 2 (Bankr. M.D.N.C. June 16, 2006) (2006 WL 4458679). Although a number of courts have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test.[4] As stated by one court:

> While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000). The Bankruptcy Administrator

---

[4]In re Behlke, 358 F.3rd 429, 437 (6th Cir. 2004) (substantial abuse found where the debtors could pay a dividend of 14% to 23%); Shaw v. U.S. Bankruptcy Adm'r (In re Shaw), 310 B.R. 358, 342 (M.D.N.C. 2004) (dividend of 29% over 36 months was found to be a significant portion of the debtors' debts); In re Norris, 225 B.R. 329, 332-33 (Bankr. E.D. Va. 1998) (substantial abuse found where debtors had ability to repay 47% of debt through a Chapter 13 plan); In re Vianese, 192 B.R. 61, 71 (Bankr. N.D.N.Y. 1996) (substantial abuse found where debtors could pay 19% to unsecured creditors in Chapter 13); In re Jarrell, 189 B.R. 374, 376 (Bankr. M.D.N.C. 1995) (substantial abuse indicated where debtors could pay 80% of debt over 36 months); In re Bryant, 47 B.R. 21, 23 (Bankr. W.D.N.C. 1984) (substantial abuse indicated where debtor, "with only a modicum of restraint," could pay 67% of his unsecured obligations over a 36 month period; but see In re Stewart, No. 07-31815, slip op. at 5 (Bankr. N.D. Ohio Jan. 15, 2008) (2008 WL 161357) (finding no abuse where debtor potentially could pay a 35% over 60 months).

argues that if adjustments are made to their deductions and expenses, the Debtors's schedules would demonstrate that they have sufficient income to fund a Chapter 13 plan.

The Mondragon court, which examined the Green factors post-BAPCPA, noted that the ability of a debtor to pay at least a 25% dividend to unsecured creditors in a Chapter 13 case is not per se abuse under Section 707(b)(3). Id. at 6 (citing Mestemaker, 359 B.R. at 858). However, the court found that "a debtor's ability to repay 25% or more of his or her unsecured non-priority debts in a Chapter 13 plan is persuasive evidence" of abuse. Id. (emphasis added). The court noted that "a debtor's ability to pay is the primary factor even under pre-BAPCPA 'substantial abuse' cases." Id.

### I. The Debtors' Original and Amended Schedules I and J

The Court will evaluate the Debtors ability to pay by considering their income and expenses as reported on their Schedules I and J. See McCain, slip op. at 3. The Court must look to the Debtors' future income and expenses, as well as evaluate their financial condition at the time of filing. Id. According to Schedule I, the Debtors had combined average monthly income of $5,339.58. The Debtors' original Schedule J showed average monthly expenses totaling $4,911.00, leaving a monthly net income of $428.58. The Debtors' amended Schedule J shows an increase in their monthly expenses of $438.24. The Debtors' average monthly expenses increased to $5,349.24, leaving a net monthly income of negative $9.66.

The Bankruptcy Administrator argues that the Debtors' amended Schedule J was filed just five days before the initial hearing, is inaccurate, is self-serving, and should not be considered by the Court. Any amendment that a debtor makes to Schedule I or J subsequent to a motion to dismiss under Section 707(b) is viewed with inherent suspicion. In re Gullett, No.

8

03-10995, slip op. at 11 (Bankr. E.D. Ky. 2004) (2004 Bankr. LEXIS 1696); In re Lee, 162 B.R. 31, 43 (Bankr. N.D. Ga. 1993).  In In re Stewart, No. 07-31815, slip op. at 3 (Bankr. N.D. Ohio 2008), the debtors amended their Schedule J in response to the filing of a Section 707(b)(3) motion by the United States Trustee.  The amended schedule J showed increased expenses that, in turn, decreased net monthly income.  Id.  The debtors also filed a reaffirmation agreement shortly before amending Schedule J, which showed the same budgetary figures as the original Schedule J.  Id.  Although ultimately finding no abuse, the Stewart court stated that "self serving amendments . . . which are made in direct response to an unfavorable action, are not viewed favorably.  Debtors are expected, on their own accord, to correct errors in their schedules; not just when faced with a Motion to Dismiss or other adverse action."  Id.

### ii.    Retirement Contributions and Loan Repayments

The only issue raised in reference to Schedule I concerns the male Debtor's retirement contribution and the female Debtor's profit sharing plan loan repayment.  Schedule I reflects that the male Debtor is contributing $144.73 per month to his retirement account.  These contributions began less than a month before the Debtors' filed their bankruptcy.  The female Debtor has an employee profit-sharing plan at Proctor & Gamble with a balance, as of December 31, 2007, of $61,167.23.  The female Debtor has borrowed three times from her profit-sharing plan.  The first loan was obtained on August 23, 2005 for the amount of $5,909.00.  The female Debtor makes biweekly payments of $59.26 on the first loan, which will be paid in full by March 1, 2010.  The second loan was obtained on November 30, 2005 for the amount of $6,300.00.  She makes biweekly payments of $72.58 on the second loan, which will be paid in full by December 11, 2010.  The third loan, which is an unauthorized post-petition loan, was obtained on October

9

4, 2007 for the amount of $5,300.00. She makes biweekly payments of $61.06 on the third loan, which will be paid in full by October 14, 2011.  The monthly payments on these loans total $385.80.  The Bankruptcy Administrator argues that the Debtors should not make retirement contributions, nor repay retirement loans, while seeking Chapter 7 relief.  The Debtors argue that if the loans are not paid back, then the Debtors will face serious tax liabilities.

Pre-BAPCPA, in the context of a Section 707(b)(3) motion, repaying 401(k) loans and making retirement contributions was a factor tending to show abuse.  See, e.g., In re Behlke, 358 F.3rd 429, 436-37 (6th Cir. 2004) (repayment of 401(k) loans is disposable income for purposes of determining ability to pay creditors); In re Austin, 299 B. R. 482, 487 (Bankr. E. D. Tenn. 2003) (collecting cases which consider retirement contributions or retirement loan repayments as disposable income for 707(b) purposes).  Post-BAPCPA, it appears this rule is still followed.  In re Zaporski 366 B.R. 758, 773 (Bankr. E. D. Mich. 2007).  Several courts have held that a debtor's ability to pay retirement loans and still pay their unsecured creditors is a factor tending to show abuse.  E.g., In re Freis, No. 06-30393, slip op. at 2 (Bankr. W. D. Mo. 2007) (2007 WL 1577752); In re Lenton 358 B. R. 651, 660 (Bankr. E. D. Pa. 2006) (when 401(k) loans can be paid off within 60 months, leaving money for unsecured creditors, it is probative of abuse).

Even if such payments were not indicative of abuse, the Bankruptcy Administrator argues that two of the female Debtor's loans will be repaid by the end of 2010, and the third loan will be repaid by October 14, 2011, at which time funds formerly used to repay the loans would be available to pay unsecured creditors under a Chapter 13 plan.[5]  Although the male Debtor's

---

[5]The Debtors are an above-median income family, and as such, in the event of a conversion to Chapter 13, the applicable commitment period would be five years.  See 11 U.S.C. §1325(b)(4)(A)(ii)(I).  The loans would be paid off before the end of a Chapter 13 plan.

retirement contribution and the female Debtor's loan repayment would not be considered for
projected disposable income purposes in a Chapter 13 plan,[6] the loans will be paid within three
years, leaving the Debtors an extra $385.80 each month to pay to unsecured creditors.  Coop v.
Lasowski (In re Lasowski), No. 07-6063, slip op. at 13-14 (8th Cir. BAP March 31, 2008) (2008
WL 833971) ("[M]any courts which have addressed the issue of whether 401(k) loan repayments
are deductible under the Section 707(b) formula in the Chapter 7 context have acknowledged
that in a Chapter 13 plan a debtor would be required to redirect funds used to repay 401(k) loans
to unsecured creditors once such loans have been repaid.  This is the mandate of Section
1322(f).") (citations omitted).  Therefore, in evaluating the Debtors' ability to pay in the context
of a Section 707(b)(3) motion, the Debtors have additional income of at least $385.80 each
month.

### iii.    The Debtor's Expenses on Their Amended Schedule J

It is appropriate for the Court to consider whether the expenses claimed by a debtor can
be reduced significantly without depriving the debtor of adequate food, clothing, shelter, or other
necessities of life.  McCain, slip op. at 3 (citing In re Engskow, 47 B.R. 314, 317 (Bankr. M.D.
Fla. 2000)).  The Bankruptcy Administrator did not argue that expenses were inflated on the
Debtors' original Schedule J, and it appears that such expenses were reasonable.

However, the Debtors' expenses on their amended Schedule J increased by $438.24.

---

[6]Voluntary contributions to qualified retirement plans should not be considered when
calculating disposable income.  In re Devilliers, 358 B.R. 849, 864 (Bankr. E.D. La. 2007); In re
Njuguna, 357 B.R. 689, 690 (Bankr. D.N.H. 2006); In re Johnson, 346 B.R. 256, 263 (Bankr.
S.D. Ga. 2006).  Voluntary payroll deductions to repay a 401(k) loan also should not be
considered for purposes of the Section 1325(b)(1)(B) test.  11 U.S.C. § 1322(f) (2005); In re
Zaporski, 366 B.R. 758, 771 (Bankr. E.D. Mich. 2007); In re Nowlin, 366 B.R. 670, 672, n.1
(Bankr. S.D. Tex. 2007).

Electricity and heating fuel (line 2a) increased by $17.00, home maintenance (line 3) increased by $80.00, medical and dental expenses (line 7) increased by $45.00, transportation costs (line 8) increased by $108.50, taxes (line 12) increased by $24.75, and other expenses (line 17) increased by $162.99 (including school lunches, haircuts, additional care for an incompetent parent, and school field trip expenses).  The Debtors provided a satisfactory explanation for the increases in electricity and heating fuel (line 2a), transportation (line 8), taxes (line 12), and other expenses (line 17).

Although the male Debtor testified that he will need new tires for his vehicle at some point, the Debtors failed to present persuasive evidence for increasing the Debtors' current transportation expenses on line 8 of Schedule J.  Similarly, although the male Debtor testified that the Debtors' home will need HVAC work, the Debtors failed to present persuasive evidence for increasing the Debtors' current home maintenance expense on line 3.  Finally, although the male Debtor testified that he will need to have his wisdom teeth removed and his daughter will need braces, the Debtors failed to present persuasive evidence for increasing the Debtors' current medical and dental expenses on line 7.  These future expenses are speculative and unsubstantiated and will be disallowed.   See In re O'Conner, 334. B.R. 462, 469 (Bankr. N.D. Fla. 2005) ("There are some expenses on the Amended Schedule J which are inappropriate which will be disallowed for purposes of this analysis. These expenses were intended to be illustrative of future expenses, but are not to be considered as 'current expenses' and included on Schedule J."); see also In re Scurlock, No. 07-81278, slip op. at 5 (Bankr. M.D.N.C. Feb. 19, 2008) ("The debtor bears the burden of demonstrating that these expenses are actual, reasonable, and necessary expenses for themselves.").

12

The Court agrees with the Bankruptcy Administrator that the increase in the Debtors' expenses for home maintenance ($80.00) and medical and dental expenses ($45.00) are inflated and should be reduced to their original amounts.  Also the increase in the Debtors' expenses for transportation should be reduced from $108.50 to $90.00.  Therefore, such reductions provide the Debtors with an ability to pay an additional $143.50 each month to unsecured creditors in a Chapter 13 plan.

### iv.    Post-petition Payments

According to Schedule D, Consumer Financial has a secured claim against the Debtors' Eclipse for $8,500.00.[7]   Payment for the Eclipse totals $356.00 per month.  According to Schedule F, Consumer Financial also has an unsecured claim for $1,500.00.  After filing, the Debtors continued their practice of making payments of $450.00 each month to Consumer Financial, which included a payment of $96.00 on the unsecured loan.  The male Debtor testified that he knew he was making payments on the unsecured claim post-petition, but he did so because the company was local, and he had a personal relationship with the owner.  The Debtors stopped making post-petition payments on the unsecured claim in January of 2008 when they were revealed to the Bankruptcy Administrator in the discovery process.  The payments on the unsecured claim of Consumer Financial were not reflected on Schedule J.  The fact that such payments were made indicates that the Debtors can make payments to their unsecured creditors.

### iv.    Conclusion

The Debtors's income on Schedule I should be increased by $385.80 due to their

---

[7] The Eclipse is listed on Schedule B as having a value of $8,500.00.  Consumer Financial has a $9,000.00 lien on the vehicle.

improper deductions for their retirement contributions and loan repayments. The Debtors' expenses on Schedule J should be reduced by $143.50 due to their improper expenses. After making these adjustments to their schedules, the Debtors are able to pay $529.30 each month toward their unsecured debts, which would provide a 100% divided to their unsecured creditors over 60 months. This fact alone demonstrates abuse. However, the statute requires a "totality of the circumstances" approach, so the Court will review the other <u>Green</u> factors.

### B. Accuracy of Schedules

The bankruptcy system relies heavily on self-reporting by debtors. <u>In re Mertz</u>, 955 F.2d 596, 598 (8th Cir. 1992) ("[T]he petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."); <u>In re Fauntleroy</u>, 311 B.R. 730, 738 (Bankr. E.D.N.C. 2004) (emphasizing that the schedules and statement of current income and expenses are to reasonably and accurately reflect DR's true financial condition). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." <u>In re Tully</u>, 818 F.2d 106, 110 (1st Cir. 1987). Innocent mistakes in the form of a few minor omissions or errors might be forgiven; but multiple inaccuracies evidence "'a pattern of reckless and cavalier disregard for the truth'" and can lead to a finding that a bankruptcy petition was filed with fraudulent intent. <u>In re Dean</u>, 299 B.R. 133, 140 (E.D. Va. 2003).

### i.    Form B22A Line 12 - Current Monthly Income

Both Debtors had stable employment during the six month period[8] before they filed their

---

[8]Since the Debtors filed a schedule I, the phrase "current monthly income" is defined as "the average monthly income from all sources that the debtor receives . . . , derived during the 6-month period ending on . . . the last day of the calendar month immediately preceding the date

bankruptcy.[9]  Both Debtors receive regular cost of living raises.  The Debtors' Form B22A

shows combined gross monthly income of $7,779.42.  Schedule I shows combined gross

monthly income of $7,850.50.  The Bankruptcy Administrator argues that the Debtors' combined

paystubs show a monthly gross income of $8,026.86, but an analysis of such paystubs shows

gross monthly income of only $7,707.00.  The Bankruptcy Administrator has the burden to prove

that the figure reported on Form B22A is inaccurate.  That burden has not been met.  The Court

finds that the current monthly income reported on Form B22A is accurate for purposes of

evaluating the Motion to Dismiss.

### ii.  Form B22A Line 25 - Taxes

At the initial hearing on this matter, the Bankruptcy Administrator argued that the

Debtors' monthly expense for taxes was overstated by $992.58 and that the correct amount

should be $1,613.00, which was the average amount withheld during each month of the

applicable period.  This amount included federal and state withholding amounts, as well as

Social Security and Medicare taxes.  At the initial hearing, the Debtors insisted that they had

correctly claimed a monthly tax expense of $2,606.00 on Form B22A.  They calculated this

amount by using their 2006 Tax Return and removing certain items that were no longer

applicable.  Prior to the continued hearing on this matter, the Debtors amended their Form B22A

---

of the commencement of the case."  11 U.S.C. § 101(10A)(A)(I) (2005).  Thus, "disposable
income" is calculated historically, during the six months prior to bankruptcy.  In re Purdy, 373
B.R. 142, 146 (Bankr. N.D. Fla. 2007).  In this case, the applicable six month period extends
from December 1, 2006 to May 31, 2007.

[9]The female Debtor has been employed at Proctor and Gamble for 11 years.  The male
Debtor is currently employed at Lorillard.  He was employed at Proctor and Gamble until April
of 2006, when he left his job at Proctor & Gamble because the Debtors were afraid that Proctor
& Gamble would institute layoffs and both of them would lose their jobs.

by reducing their monthly tax expense deduction to $2,325.26.  To calculate this figure, the Debtors used their tax rate from their 2006 Tax Return, adjusted that rate by eliminating deductions that would not be recurring in the present year, used their 2006 Social Security and Medicare tax rates, and multiplied these amounts by their average gross income for the applicable period.  The 2006 Tax Return showed an actual tax liability of $19,450.00 and gross income of $136,027.00.  The Debtor added back $4,444.00 in business losses to gross income and reduced their itemized deductions by $4,595.00, which represents the amount of charitable deductions taken in 2006 that they would not be eligible to take in 2007.  The Debtors assert that this calculation results in a total combined rate of 30.07%.  Next, the Debtors multiplied the rate by their average income for the applicable period ($7,779.42), which results in a monthly tax expense of $2,325.26.  The Bankruptcy Administrator argues the Debtors' method is faulty because the Debtors included $38,765.00 in taxable income from the male Debtor's retirement account withdrawal, which does not represent recurring income for the Debtors

At the continued hearing, the Bankruptcy Administrator offered an alternative method for calculating the Debtors' monthly tax expense.  This method starts with the Debtors' total wages as reflected on their 2006 Tax Return and reduces it by the Debtors' deductions, which yields their taxable income.  The Bankruptcy Administrator then applies rates derived from the federal and state income tax tables and adds amounts for Social Security and Medicare taxes. This calculation results in a monthly tax expense of $1,888.50.

The last tax return filed by the Debtors was for calendar year 2006 (the "2006 Tax Return").  It reflects that they had adjusted gross income of $136,027.00 in 2006.  This amount includes $38,765.00 that was distributed to the Debtors from the male Debtor's profit sharing

16

plan with Proctor & Gamble.  The Debtors paid $3,877.00 in taxes due to this early withdrawal.

Altogether, the Debtors paid $19,450.00 in federal taxes in 2006.  The Debtors have completed

their 2007 income tax return but have not filed it. The female Debtor testified that the Debtors

will get a refund, but she could not state the amount.

The Debtors and the Bankruptcy Administrator advocate different methods to calculate

the Debtors' monthly tax deduction.  Line 25 of Form B22A requires a debtor to disclose and

deduct "Other Necessary Tax Expense: taxes."  Form B22A instructs a debtor to enter the "total

average monthly expense you actually incur" for all federal, state, and local taxes, including

Social Security and Medicare, but not including sales or real estate taxes.

Courts have held that an above-median Chapter 7 debtor's "average monthly tax

expense" is their actual tax liability and not only the amount withheld from their paychecks.  In

re Robinette, No.06-10585, slip op. at 3 (Bankr. D.N.M Oct. 2, 2007) (2007 WL 2955960); In re

Bishop, No. 07-50431, slip op. at 9-10 (Bankr. E.D. Ky. Sept. 17, 2007) (2007 Bankr. Lexis

3096).  These courts look to the treatment of line 30 of Form B22C in Chapter 13 cases, which is

has the same instructions as line 25 on Form B22A.  "[A]n apparent majority of post-BAPCPA

cases hold that the allowable amount . . . is the debtor's actual tax liability, not the amount

withheld from the paycheck."  Bishop, slip op. at 4.  See In re Lawson, 361 B.R. 215, 222

(Bankr. D. Utah 2007); In re Balcerowski, 353 B.R. 581, 586-587 (Bankr. E.D. Wis.2006); In re

Risher, 344 B.R. 833, 834 (Bankr. W.D. Ky. 2006).

The Bishop court was persuaded that a debtor should not deduct his actual tax expense

because a debtor in a Chapter 7 case could overwithhold, thereby creating an "expense" that

would be refunded after the debtor's case is closed.  Bishop, slip op. at 10.  In this case, the

17

Debtors claim a tax expense that is greater than the amount withheld on their paychecks.  The

problem with using the amounts withheld from the Debtors' paychecks is that they may not be

"reasonable and necessary expenses," as is required on Form B22A.  An underwithholding

debtor owes additional taxes that are reasonable and necessary, which the taxing authorities will

require her to pay when she files her tax return.  Either way, the payroll withholding amounts for

taxes are not necessarily reliable[10], and therefore, a determination of the debtor's actual tax

liability is necessary.

The Internal Revenue Code (the "IRC") requires individuals to use accurate withholding

amounts for their payroll deductions.  26 U.S.C. §§ 3401-3406.  If the withholding amounts are

accurate, then a taxpayers' monthly tax expenses are the amounts deducted on their paycheck by

their employer or the amount that the taxpayer sends to the Internal Revenue Service (the "IRS")

if they are self-employed.  For most taxpayers, however, they must reconcile these withholding

amounts with the IRS on their tax return in order to determine their actual tax liability for the

year.  If the taxpayer has either underwithheld, overwithheld, or had unanticipated changes in

their allowed deductions, a payment or return is required.  Therefore, if the end-of-year

reconciliation has not occurred, what is the average monthly tax expense incurred by the

taxpayer-debtor for purposes of line 25 on Form B22A?  How is it calculated?

The Court does not expect a debtor or her counsel to be able to see into the future, so any

method that reasonably and accurately reflects the debtor's actual tax expense for the six-month

period would meet the requirements of line 25 on Form B22A.  One extreme would be for the

---

[10]This is not to say that a debtor could not use her payroll withholding amounts in line 25
of Form B22A if they are, in fact, the debtor's actual tax expenses.

18

debtor to simply use her actual payroll deductions, which is an imperfect solution because, as explained above, the results are not necessarily reliable.  The other extreme is for the debtor to complete a short form tax return, which is an impractical solution because it would require significant effort and expense by the debtor and her counsel, and they may not be able to complete it in a timely manner.  There is a better solution.  When the six-month period of Section 101(10A) occurs during a period for which federal and state tax returns already have been filed, it is reasonable for the debtor to use the rates indicated on those returns.  If the six-month period is only partially covered by a previously-filed tax return, then the debtor should proportionately mix the rate on the return with the present year's rate for the annualized income. For the period in the new tax year, the debtor should remove from the previous year's return all actual changes, such as charitable giving, and non-recurring income, loss, and deductions, and add in any new changes that the debtor can demonstrate. This process does not require the debtor's counsel to be a tax expert.  Rather, it gives counsel the ability to accurately represent the debtor's tax liability.

　　In the present case, the Debtors' applicable six-month period was from December 1, 2006 to May 31, 2007, so the first month of the period was in the Debtors' 2006 tax year, and the last five months were in their 2007 tax year.  To determine the 2006 tax rate, the Debtors should divide the $19,450 in federal tax liability by $93,335 in taxable income[11], yielding a rate of 20.83%.  For the state tax rate, the Debtors should divide the $7,926 state tax liability by their

---

　　　[11]Taxable income, not gross income or wages, is required because actual tax liability derives from taxable income.  26 U.S.C. §§ 1- 63.

$114,593[12] of taxable income, yielding a rate of 6.92%.  This yields a total tax rate of 27.75%.

The Debtors have filed no tax return for calendar year 2007.  Taking into account the modifications to the Debtors' 2006 income suggested by both the Debtors and the Bankruptcy Administrator for 2007,[13] the Debtors have $63,179[14] of taxable income in 2007.  This creates federal tax liability of $8,044[15] and state liability of $4,210.[16]  Thus, the total tax rate for the five months in 2007 is 19.4%.  The weighted federal and state tax rate over the entire six-month period is 20.8%[17].  If one adds 7.45% in Social Security and Medicare taxes, the total tax rate is 28.25%.  This calculation yields a monthly tax expense of $2,197.69 for the Debtors.  Because the Debtors' amended tax expense was $2,325.56, the Court finds that the Debtors' tax expense on line 25 of Form B22A was overstated by $127.87.

### iii.    Form B22A Line 27 - Life Insurance

The Debtors deducted $74.80 on line 27 of Form B22A for monthly payments on five life

---

[12]The Debtor's 2006 state tax return was not introduced into evidence. The Debtor asserted that this was the amount to be taxed for state tax purposes, which the Bankruptcy Administrator did not dispute.

[13]They add a $4,444 business loss to gross income and reduce the Debtors' itemized deductions by $4,595 because of reduced charitable contributions in 2007.  Lastly, they exclude from income the taxable income that the Debtors received from the male Debtor's retirement account withdrawal and the extra tax on that transaction.

[14]The calculation is as follows: $101,706 in adjusted gross income minus $24,927 in deductions and $13,600 in exemptions.

[15]IRS Form 1040TT (2007)(this is the amount of tax owed for the taxable income of $63,150-63,200 for the "married filing jointly" status).

[16]Because the state tax return was not introduced into evidence, no adjustments can be made to the return.  But the North Carolina tax return is based on the federal return, so the Court will use the same taxable income.

[17]The Court uses the formula: (1/6 x 2006 actual rate) + (5/6 x 2007 estimated  rate).

insurance policies.  The Debtors testified that they pay $61.56 each month for four whole life insurance policies.[18]   Additionally, the female Debtor has $13.00 deducted each month from her paycheck for another life insurance policy.  The Bankruptcy Administrator argues that the Debtors should not have deducted for payments on the whole life insurance policies; rather, the Debtors should only deduct the $13.00 monthly payment for the female Debtors' term life insurance policy.  The Debtors do not dispute that the other four policies are whole life policies. Line 27 specifically states the deduction is for term life insurance premiums only and directs debtors "not [to] include premiums for insurance on your dependents, for whole life or for any other form of insurance."  Therefore, the Court finds that the Debtors improperly deducted $61.80 of the $74.80 listed on line 27 of their Form B22A.

### iv.    Form B22A Line 30 - Childcare

The Debtors testified that the male Debtor's sister, Mrs. Williams, now provides childcare for the Debtors' two children.  The Debtors pay $10.00 each month to Mrs. Williams for gas to transport the children to school, which averages about $40.00 per month.  The Debtors also provide Mrs. Williams with food for the children.  The cost of the food averages about $33.00 each week, or $132.00 per month.  On line 30 of Form B22A, the Debtors deducted $100.00 each month for childcare.  The Bankruptcy Administrator argues that the Debtors have overstated their childcare expenses by $60.00 per month because the amounts that the Debtors pay to Mrs. Williams for groceries is already included in the Debtors' expenses for food.  The Court finds that payment for the food that the children consume while under the care of Mrs.

---

[18]The insured persons on the policies are the male Debtor, the Debtors' son, the Debtors' daughter, and the male Debtor's step-daughter.

21

Williams is part of the Debtors' childcare expense. It is the same as if the Debtors paid $60.00 each month to Mrs. Williams, and she bought food with it. Therefore, it is reasonable for the Debtors to deduct the entire $100.00 on line 30 of Form B22A.

### v.    Form B22A Line 31 - Healthcare

On line 31 of Form B22A, the Debtors deducted $138.00 for healthcare expenses. However, they were only able to provide evidence for healthcare expenses averaging $44.57 each month. The Debtors could not explain how they computed the $138.00 deduction. Part of the difference between their actual expenses and the claimed deduction may be attributable to the Debtors' anticipated dental and orthodontic expenses. The Bankruptcy Administrator argues that the healthcare expenses are overstated by $96.00 each month. The actual difference in the documented healthcare expenses and the Debtors' claimed deduction is $93.43. Since the Debtors could not account for the difference in the alleged expenses and the claimed deduction, the Court finds that it was improper for the Debtors to deduct $93.43 of the $138.00 listed on line 31 of Form B22A.

### vi.    Form B22A Line 42 - Deduction for Future Payment on Secured Claims

On Form B22A, the Debtors took deductions for future payments on secured claims. The Debtors deducted $177.46 for payments to SLM Financial for a 2004 Hornet Camper Trailer (the "Camper"). The Debtors also deducted $216.90 for payments to Triad Financial for a 2000 Lincoln LS automobile (the "Vehicle"). Their Statement of Financial Affairs indicates that the Debtors intended to surrender a Camper and the Vehicle. These items were not listed on Schedule B of the Debtors' petition. SLM Financial repossessed the Camper on May 6, 2007,

22

and sold the Camper on May 16, 2007 for $8,575.00.   Triad Financial repossessed the Vehicle

on May 18, 2007, but it has not been sold.  The Debtors have not made payments on the Camper

or the Vehicle since filing their petition. The Bankruptcy Administrator argues that the total

amount of the secured payments for the Camper and the Vehicle should not be deducted on Form

B22A.  The Debtors agree that they should not be allowed to deduct the secured payment for the

Camper, but they insist that they still may deduct the secured payment of $216.90 for the Vehicle

because it has not been sold, and they are still liable on the debt secured by the Vehicle.  The

Debtors' argument is without merit.  Section 707(b)(2)(A)(iii)(I) directs that the "debtor's

average monthly payments on account of secured debts shall be calculated as the sum of . . . the

total of all amounts scheduled as contractually due to secured creditors in each month of the 60

months following the date of the petition."  The Vehicle was repossessed prior to filing their

petition.  The Debtors did not list the Vehicle on Schedule B.  Post-petition, they did not make

any payments on the Vehicle and did not attempt to regain possession of it.  In fact, the Debtors

admitted that the Vehicle was too expensive and that they had to surrender it.  They indicated as

much on their Statement of Financial Affairs.  SLM Financial is not a "secured creditor" in the

context of Section 707(b)(2)(A)(iii)(I), and the amounts due to SLM Financial are not

"scheduled as contractually due"[19] in any of the 60 months following the date of the petition.

---

[19] "Contractually due" may be defined as when a debtor is "contractually obligated to
make payments in some or all of the 60 months subsequent to the time [he or she] filed [a]
bankruptcy petition."  In re Haar,  360 B.R. 759, 764 (Bankr. N.D. Ohio 2007).  Numerous cases
have considered deductions by debtors for secured debts on collateral that the debtors intended
to surrender post-petition.  There are three schools of thought on whether the debtors should be
allowed to take such a deduction under Section 707(b)(2)(A)(iii).  See In re Ray, 362 B.R. 680,
685 (Bankr. D.S.C. 2007).  The first line of cases has allowed debtors to deduct for secured
payments on property that they intend to surrender post-petition.  See In re Sorrell, 359 B.R. 167,
184-185 (Bankr. S.D. Ohio 2007); In re Walker, No. 05-15010, slip op. at *8 (Bankr. N.D. Ga.

23

Even though SLM Financial has a deficiency claim on the Vehicle, that amount would only constitute an unsecured claim. Therefore, the Court finds that neither the payments for the Camper nor the Vehicle should have been deducted on line 42 of Form B22A, which therefore has been overstated by $394.36.

### vii.    Unscheduled Assets

On Schedule B, the Debtors listed their interest in a whole life insurance policy (line 9) but indicated that it had no value. However, the Debtors have four life policies with a total surrender value of $2,154.75. The Debtors own a 2006 Cub Cadet law tractor (the "Tractor"), which they purchased in 2006 for $4,325.00. The Debtors value the Tractor at $3,900. It was not listed on their schedules. The male Debtor testified that he did not know why the Tractor was not listed, and that it was an oversight.

---

May 1, 2006) (2006 WL 1314125); In re Randle, 358 B.R. 360, 364 (Bankr. N.D. Ill. 2006); In re Simmons, 357 B.R. 480, 483-484 (Bankr. N.D. Ohio 2006). These cases hold that the plain language of "scheduled as contractually due" allows a debtor to deduct all payments due under contract on secured debts as of the petition date. These cases use the petition date as the date to determine whether a secured payment is deductible, regardless of whether the debtor intends to later surrender the property. The second line of cases holds that even though a stated intention to surrender collateral does not extinguish the debtor's right to deduct for the secured payments, for purposes of a motion to dismiss for abuse under Section 707(b), "the relevant date on which calculations should be based is the date of the filing of the motion [to dismiss], not the date of the filing of the petition." In re Singletary, 354 B.R. 455, 458 (Bankr. D. Tex. 2006); see also In re Zak, 361 B.R. 481, 484-485 (Bankr. N.D. Ohio 2007); In re Nockerts, 357 B.R. 497, 500-501 (Bankr. E.D. Wis. 2006). The third line of cases holds that a debtor's schedules form the basis from which the Court should determine whether a debt is "scheduled as contractually due" and that a debtor has an obligation to make sure that his schedules are current. "To focus on the single term 'contractually due' without due consideration of the import of the term 'scheduled' and the phrase 'in each of the 60 months following the date of the petition' will miss the actual meaning and the intent of § 707(b)(2)." In re Skaggs, 349 B.R. 594, 599-600 (Bankr. D. Mo. 2006) (internal citations omitted); see also In re Harris, 353 B.R. 304, 308-309 (Bankr. D. Okla. 2006) (rejecting Walker and finding that the means test was designed to require that debtors who can pay do so).

24

### viii.    Conclusion

The Bankruptcy Administrator has demonstrated several inaccuracies on the Debtors' schedules. These inaccuracies include (1) failing to list the total surrender value for the four life insurance policies, (2) improperly claiming an expense for four whole life insurance policies, (3) failing to disclose ownership of the Tractor, (4) overstating their healthcare expenses, (5) overstating their childcare expenses, (6) overstating their tax expenses, and (7) deducting secured payments on the Camper and the Vehicle. These inaccuracies tend to show abuse.[20]

### C. Excessive or Unreasonable Family Budget

Courts look to the facts of a case to determine whether debtors have an excessive or unreasonable family budget. The Bankruptcy Administrator argues that some of the Debtors' expenses are inflated, but the Debtors' housing expense is not unreasonable or excessive for a family of four, and the Debtors explained in detail the increases in expenses on their amended Schedule J. They have tried to limit their expenses, including surrendering the Vehicle and the Camper. The Court concludes that the Debtors' budget is not excessive or unreasonable. This factor does not show abuse.

### D. Good Faith

The Court must determine whether the Debtors are misusing the bankruptcy process to achieve some illicit purpose. "Good faith" is defined as "a state of mind consisting in (1) honesty in belief or purpose, . . . or (4) absence of intent to defraud or seek unconscionable advantage." Black's Law Dictionary 713 (8th ed. 2004). "Presumably, 'good faith' [within the

---

[20]In total, the Debtors' deductions on Form B22A should be $677.46 less than what was submitted. A recalculated Form B22A would show $169.76 per month in disposable income, which is sufficient for the presumption of abuse to arise under Section 707(b)(2)(A).

25

meaning of Section 707(b)] means subjective good faith." In re Dominguez, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994). The fact that a debtor lives beyond her means up to and even during the time of her bankruptcy weighs against a finding of good faith. See U.S. Trustee for the Western Dist. of Va. v. Harrelson, 323 B.R. 176, 179 (W.D. Va. 2005) (budget was unreasonable); In re Adams, No. 06-16027, slip op. at 4 (Bankr. D. Md. Oct. 18, 2007) (2007 WL 3091583) ($1,300,000 residence, luxury car with $1,225 monthly payment, and unreasonable budget); see also In re Stewart, 175 F.3d 796, 810 (10th Cir. 1999) (physician-debtor's opting for a lower paying job, disregarding his family support obligations, and buying a $26,000 vehicle instead of paying for those expenses was sufficient to call into question debtor's good faith); In re Oot, 368 B.R. 662, 680 (N.D. Ohio Mar. 19, 2007) (quoting Kornfield v. Schwartz (In re Kornfield), 164 F.3d 778, 781 (2d Cir. 1999)) ("[T]his is a paradigm of the case that Section 707(b) was designed for: debtors enjoying a substantial income but seeking to transfer the cost of an unnecessary lifestyle to creditors."). The Bankruptcy Administrator does not allege that the Debtors did not file their petition in good faith. The Court concludes that the Debtors filed their petition in good faith.

### E. Sudden Illness, Calamity, Disability, or Unemployment

The Debtors did not file their bankruptcy due to sudden illness, calamity, disability, or unemployment. They testified that they filed because they simply could not pay their bills as they came due. This factor tends to show abuse.

## IV. CONCLUSION

The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer "substantial abuse," but rather just "abuse," a lower standard. The Debtors did not file due to

sudden illness, unemployment, or disability.  They have the ability to pay $529.30 per month to their unsecured creditors in a Chapter 13 plan, which would constitute a 100% dividend.  The inaccuracies on the Debtors' schedules tend to show abuse.  The Debtors do not have an excessive or unreasonable budget, nor did they file their petition in bad faith.  Based on the totality of the circumstances and the lower standard of abuse under BAPCPA, the Court finds that allowing the Debtors to continue in a Chapter 7 would constitute an abuse of the Bankruptcy Code within the meaning of Section 707(b)(3).

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**


IN RE:                                    )
                                          )
WILLIAM IRVIN LIPFORD and                 )        Case No. 07-10776
REBECCA ANN LIPFORD,                      )
                                          )
                         Debtors.         )
_____)


## PARTIES IN INTEREST

William and Rebecca Lipford
Philip E. Bolton, Esq.
Michael D. West, Bankruptcy Administrator
Gerald S. Schafer, Chapter 7 Trustee